(Slip Opinion)          OCTOBER  TERM,  2008          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FOREST GROVE SCHOOL DISTRICT *v.* T. A.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–305.   Argued April 28, 2009—Decided June 22, 2009

After a private specialist diagnosed respondent with learning disabilities, his parents unilaterally removed him from petitioner public school district (School District), enrolled him in a private academy, and requested an administrative hearing on his eligibility for special-education services under the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. §1400 *et seq.* The School District found respondent ineligible for such services and declined to offer him an individualized education program (IEP). Concluding that the School District had failed to provide respondent a "free appropriate public education" as required by IDEA, §1412(a)(1)(A), and that respondent's private-school placement was appropriate, the hearing officer ordered the School District to reimburse his parents for his private-school tuition. The District Court set aside the award, holding that the IDEA Amendments of 1997 (Amendments) categorically bar reimbursement unless a child has "previously received special education or related services under the [school's] authority." §1412(a)(10)(C)(ii). Reversing, the Ninth Circuit concluded that the Amendments did not diminish the authority of courts to grant reimbursement as "appropriate" relief pursuant to §1415(i)(2)(C)(iii). See *School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359, 370.

*Held:* IDEA authorizes reimbursement for private special-education services when a public school fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special-education services through the public school. Pp. 6–17.

(a) This Court held in *Burlington* and *Florence County School Dist. Four* v. *Carter,* 510 U. S. 7, that §1415(i)(2)(C)(iii) authorizes courts

to reimburse parents for the cost of private-school tuition when a school district fails to provide a child a FAPE and the private-school placement is appropriate. That *Burlington* and *Carter* involved the deficiency of a proposed IEP does not distinguish this case, nor does the fact that the children in *Burlington* and *Carter* had previously received special-education services; the Court's decision in those cases depended on the Act's language and purpose rather than the particular facts involved. Thus, the reasoning of *Burlington* and *Carter* applies unless the 1997 Amendments require a different result. Pp. 6–8.

(b) The 1997 Amendments do not impose a categorical bar to reimbursement. The Amendments made no change to the central purpose of IDEA or the text of §1415(i)(2)(C)(iii). Because Congress is presumed to be aware of, and to adopt, a judicial interpretation of a statute when it reenacts that law without change, *Lorillard* v. *Pons*, 434 U. S. 575, 580, this Court will continue to read §1415(i)(2)(C)(iii) to authorize reimbursement absent a clear indication that Congress intended to repeal the provision or abrogate *Burlington* and *Carter.* The School District's argument that §1412(a)(10)(C)(ii) limits reimbursement to children who have previously received public special-education services is unpersuasive for several reasons: It is not supported by IDEA's text, as the 1997 Amendments do not expressly prohibit reimbursement in this case and the School District offers no evidence that Congress intended to supersede *Burlington* and *Carter;* it is at odds with IDEA's remedial purpose of "ensur[ing] that all children with disabilities have available to them a [FAPE] that emphasizes special education . . . designed to meet their unique needs," §1400(d)(1)(A); and it would produce a rule bordering on the irrational by providing a remedy when a school offers a child inadequate special-education services but leaving parents remediless when the school unreasonably denies access to such services altogether. Pp. 8–15.

(c) The School District's argument that any conditions on accepting IDEA funds must be stated unambiguously is clearly satisfied here, as States have been on notice at least since *Burlington* that IDEA authorizes courts to order reimbursement. The School District's claims that respondent's reading will impose a heavy financial burden on public schools and encourage parents to enroll their children in private school without first trying to cooperate with public-school authorities are also unpersuasive in light of the restrictions on reimbursement awards identified in *Burlington* and the fact that parents unilaterally change their child's placement at their own financial risk. See*, e.g., Carter*, 510 U. S., at 15. Pp. 15–16.

523 F. 3d 1078, affirmed.

Syllabus

STEVENS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and ALITO, JJ., joined. SOUTER, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–305

FOREST GROVE SCHOOL DISTRICT, PETITIONER
*v.* T. A.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2009]

JUSTICE STEVENS delivered the opinion of the Court.

The Individuals with Disabilities Education Act (IDEA or Act), 84 Stat. 175, as amended, 20 U. S. C. §1400 *et seq.,* requires States receiving federal funding to make a "free appropriate public education" (FAPE) available to all children with disabilities residing in the State, §1412(a)(1)(A). We have previously held that when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education. See *School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359, 370 (1985). The question presented in this case is whether the IDEA Amendments of 1997 (Amendments), 111 Stat. 37, categorically prohibit reimbursement for private-education costs if a child has not "previously received special education and related services under the authority of a public agency." §1412(a)(10)(C)(ii). We hold that the Amendments impose no such categorical bar.

## I

Respondent T. A. attended public schools in the Forest Grove School District (School District or District) from the time he was in kindergarten through the winter of his junior year of high school. From kindergarten through eighth grade, respondent's teachers observed that he had trouble paying attention in class and completing his assignments. When respondent entered high school, his difficulties increased.

In December 2000, during respondent's freshman year, his mother contacted the school counselor to discuss respondent's problems with his schoolwork. At the end of the school year, respondent was evaluated by a school psychologist. After interviewing him, examining his school records, and administering cognitive ability tests, the psychologist concluded that respondent did not need further testing for any learning disabilities or other health impairments, including attention deficit hyperactivity disorder (ADHD). The psychologist and two other school officials discussed the evaluation results with respondent's mother in June 2001, and all agreed that respondent did not qualify for special-education services. Respondent's parents did not seek review of that decision, although the hearing examiner later found that the School District's evaluation was legally inadequate because it failed to address all areas of suspected disability, including ADHD.

With extensive help from his family, respondent completed his sophomore year at Forest Grove High School, but his problems worsened during his junior year. In February 2003, respondent's parents discussed with the School District the possibility of respondent completing high school through a partnership program with the local community college. They also sought private professional advice, and in March 2003 respondent was diagnosed with ADHD and a number of disabilities related to learning and memory. Advised by the private specialist that respon-

dent would do best in a structured, residential learning environment, respondent's parents enrolled him at a private academy that focuses on educating children with special needs.

Four days after enrolling him in private school, respondent's parents hired a lawyer to ascertain their rights and to give the School District written notice of respondent's private placement. A few weeks later, in April 2003, respondent's parents requested an administrative due process hearing regarding respondent's eligibility for special-education services. In June 2003, the District engaged a school psychologist to assist in determining whether respondent had a disability that significantly interfered with his educational performance. Respondent's parents cooperated with the District during the evaluation process. In July 2003, a multidisciplinary team met to discuss whether respondent satisfied IDEA's disability criteria and concluded that he did not because his ADHD did not have a sufficiently significant adverse impact on his educational performance. Because the School District maintained that respondent was not eligible for special-education services and therefore declined to provide an individualized education program (IEP),[1] respondent's parents left him enrolled at the private academy for his senior year.

The administrative review process resumed in September 2003. After considering the parties' evidence, including the testimony of numerous experts, the hearing officer issued a decision in January 2004 finding that respondent's ADHD adversely affected his educational performance and that the School District failed to meet its obliga-

—————

[1] An IEP is an education plan tailored to a child's unique needs that is designed by the school district in consultation with the child's parents after the child is identified as eligible for special-education services. See 20 U. S. C. §§1412(a)(4), 1414(d).

tions under IDEA in not identifying respondent as a student eligible for special-education services. Because the District did not offer respondent a FAPE and his private-school placement was appropriate under IDEA, the hearing officer ordered the District to reimburse respondent's parents for the cost of the private-school tuition.[2]

The School District sought judicial review pursuant to §1415(i)(2), arguing that the hearing officer erred in granting reimbursement. The District Court accepted the hearing officer's findings of fact but set aside the reimbursement award after finding that the 1997 Amendments categorically bar reimbursement of private-school tuition for students who have not "previously received special education and related services under the authority of a public agency." §612(a)(10)(C)(ii), 111 Stat. 63, 20 U. S. C. §1412(a)(10)(C)(ii). The District Court further held that, "[e]ven assuming that tuition reimbursement may be ordered in an extreme case for a student not receiving special education services, under general principles of equity where the need for special education was obvious to school authorities," the facts of this case do not support equitable relief. App. to Pet. for Cert. 53a.

The Court of Appeals for the Ninth Circuit reversed and remanded for further proceedings. The court first noted that, prior to the 1997 Amendments, "IDEA was silent on the subject of private school reimbursement, but courts had granted such reimbursement as 'appropriate' relief under principles of equity pursuant to 20 U. S. C. §1415(i)(2)(C)." 523 F. 3d 1078, 1085 (2008) (citing *Burlington*, 471 U. S., at 370). It then held that the Amendments do not impose a categorical bar to reimbursement

_____

[2] Although it was respondent's parents who initially sought reimbursement, when respondent reached the age of majority in 2003 his parents' rights under IDEA transferred to him pursuant to Ore. Admin. Rule 581–015–2325(1) (2008).

when a parent unilaterally places in private school a child who has not previously received special-education services through the public school. Rather, such students "are eligible for reimbursement, to the same extent as before the 1997 amendments, as 'appropriate' relief pursuant to §1415(i)(2)(C)." 523 F. 3d, at 1087–1088.

The Court of Appeals also rejected the District Court's analysis of the equities as resting on two legal errors. First, because it found that §1412(a)(10)(C)(ii) generally bars relief in these circumstances, the District Court wrongly stated that relief was appropriate only if the equities were sufficient to "'override'" that statutory limitation. The District Court also erred in asserting that reimbursement is limited to "'extreme'" cases. *Id.*, at 1088 (emphasis deleted). The Court of Appeals therefore remanded with instructions to reexamine the equities, including the failure of respondent's parents to notify the School District before removing respondent from public school. In dissent, Judge Rymer stated her view that reimbursement is not available as an equitable remedy in this case because respondent's parents did not request an IEP before removing him from public school and respondent's right to a FAPE was therefore not at issue.

Because the Courts of Appeals that have considered this question have reached inconsistent results,[3] we granted certiorari to determine whether §1412(a)(10)(C) establishes a categorical bar to tuition reimbursement for students who have not previously received special-education services under the authority of a public education agency.

_____

[3] Compare *Frank G.* v. *Board of Ed. of Hyde Park*, 459 F. 3d 356, 376 (CA2 2006) (holding that §1412(a)(10)(C)(ii) does not bar reimbursement for students who have not previously received public special-education services), and *M. M.* v. *School Bd. of Miami-Dade Cty., Fla.*, 437 F. 3d 1085, 1099 (CA11 2006) *(per curiam)* (same), with *Greenland School Dist.* v. *Amy N.*, 358 F. 3d 150, 159–160 (CA1 2004) (finding reimbursement barred in those circumstances).

555 U. S. ___ (2009).[4]

## II

Justice Rehnquist's opinion for a unanimous Court in *Burlington* provides the pertinent background for our analysis of the question presented. In that case, respondent challenged the appropriateness of the IEP developed for his child by public-school officials. The child had previously received special-education services through the public school. While administrative review was pending, private specialists advised respondent that the child would do best in a specialized private educational setting, and respondent enrolled the child in private school without the school district's consent. The hearing officer concluded that the IEP was not adequate to meet the child's educational needs and that the school district therefore failed to provide the child a FAPE. Finding also that the private-school placement was appropriate under IDEA, the hearing officer ordered the school district to reimburse respondent for the cost of the private-school tuition.

We granted certiorari in *Burlington* to determine whether IDEA authorizes reimbursement for the cost of private education when a parent or guardian unilaterally enrolls a child in private school because the public school has proposed an inadequate IEP and thus failed to provide a FAPE. The Act at that time made no express reference to the possibility of reimbursement, but it authorized a court to "grant such relief as the court determines is appropriate." §1415(i)(2)(C)(iii).[5] In determining the scope

––––––––

[4] We previously granted certiorari to address this question in *Board of Ed. of City School Dist. of New York* v. *Tom F.*, 552 U. S. 1 (2007), in which we affirmed without opinion the judgment of the Court of Appeals for the Second Circuit by an equally divided vote.

[5] At the time we decided *Burlington*, that provision was codified at §1415(e)(2). The 1997 Amendments renumbered the provision but did not alter its text. For ease of reference, we refer to the provision by its current section number, §1415(i)(2)(C)(iii).

of the relief authorized, we noted that "the ordinary meaning of these words confers broad discretion on the court" and that, absent any indication to the contrary, what relief is "appropriate" must be determined in light of the Act's broad purpose of providing children with disabilities a FAPE, including through publicly funded private-school placements when necessary. 471 U. S., at 369. Accordingly, we held that the provision's grant of authority includes "the power to order school authorities to reimburse parents for their expenditures on private special-education services if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Ibid.*

Our decision rested in part on the fact that administrative and judicial review of a parent's complaint often takes years. We concluded that, having mandated that participating States provide a FAPE for every student, Congress could not have intended to require parents to either accept an inadequate public-school education pending adjudication of their claim or bear the cost of a private education if the court ultimately determined that the private placement was proper under the Act. *Id.,* at 370. Eight years later, we unanimously reaffirmed the availability of reimbursement in *Florence County School Dist. Four* v. *Carter*, 510 U. S. 7 (1993) (holding that reimbursement may be appropriate even when a child is placed in a private school that has not been approved by the State).

The dispute giving rise to the present litigation differs from those in *Burlington* and *Carter* in that it concerns not the adequacy of a proposed IEP but the School District's failure to provide an IEP at all. And, unlike respondent, the children in those cases had previously received public special-education services. These differences are insignificant, however, because our analysis in the earlier cases depended on the language and purpose of the Act and not the particular facts involved. Moreover, when a child

requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP. It is thus clear that the reasoning of *Burlington* and *Carter* applies equally to this case. The only question is whether the 1997 Amendments require a different result.

### III

Congress enacted IDEA in 1970[6] to ensure that all children with disabilities are provided "'a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'" *Burlington*, 471 U. S., at 367 (quoting 20 U. S. C. §1400(c) (1982 ed.), now codified as amended at §§1400(d)(1)(A), (B)). After examining the States' progress under IDEA, Congress found in 1997 that substantial gains had been made in the area of special education but that more needed to be done to guarantee children with disabilities adequate access to appropriate services. See S. Rep. No. 105–17, p. 5 (1997). The 1997 Amendments were intended "to place greater emphasis on improving student performance and ensuring that children with disabilities receive a quality public education." *Id.*, at 3.

Consistent with that goal, the Amendments preserved the Act's purpose of providing a FAPE to all children with disabilities. And they did not change the text of the provision we considered in *Burlington*, §1415(i)(2)(C)(iii), which gives courts broad authority to grant "appropriate" relief, including reimbursement for the cost of private special

---

[6] The legislation was enacted as the Education of the Handicapped Act, title VI of Pub. L. 91–230, 84 Stat. 175, and was renamed the Individuals with Disabilities Education Act in 1990, see §901(a)(3), Pub. L. 101–476, 104 Stat. 1142.

education when a school district fails to provide a FAPE. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978). Accordingly, absent a clear expression elsewhere in the Amendments of Congress' intent to repeal some portion of that provision or to abrogate our decisions in *Burlington* and *Carter*, we will continue to read §1415(i)(2)(C)(iii) to authorize the relief respondent seeks.

The School District and the dissent argue that one of the provisions enacted by the Amendments, §1412(a)(10)(C), effects such a repeal. Section 1412(a)(10)(C) is entitled "Payment for education of children enrolled in private schools without consent of or referral by the public agency," and it sets forth a number of principles applicable to public reimbursement for the costs of unilateral private-school placements. Section 1412(a)(10)(C)(i) states that IDEA "does not require a local educational agency to pay for the cost of education . . . of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child" and his parents nevertheless elected to place him in a private school. Section 1412(a)(10)(C)(ii) then provides that a "court or hearing officer may require [a public] agency to reimburse the parents for the cost of [private-school] enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available" and the child has "previously received special education and related services under the authority of [the] agency." Finally, §1412(a)(10)(C)(iii) discusses circumstances under which the "cost of reimbursement described in clause (ii) may be reduced or denied," as when a parent fails to give 10 days' notice before removing a child from public school or refuses to make a child available for evaluation, and §1412(a)(10)(C)(iv) lists circumstances in

which a parent's failure to give notice may or must be excused.[7]

Looking primarily to clauses (i) and (ii), the School District argues that Congress intended §1412(a)(10)(C) to provide the exclusive source of authority for courts to order reimbursement when parents unilaterally enroll a child in private school. According to the District, clause (i) provides a safe harbor for school districts that provide a FAPE by foreclosing reimbursement in those circumstances. Clause (ii) then sets forth the circumstance in which reimbursement is appropriate—namely, when a school district fails to provide a FAPE to a child who has previously received special-education services through the public school. The District contends that because §1412(a)(10)(C) only discusses reimbursement for children who have previously received special-education services through the public school, IDEA only authorizes reimbursement in that circumstance. The dissent agrees.

For several reasons, we find this argument unpersuasive. First, the School District's reading of the Act is not supported by its text and context, as the 1997 Amendments do not expressly prohibit reimbursement under the circumstances of this case, and the District offers no evidence that Congress intended to supersede our decisions in *Burlington* and *Carter*. Clause (i)'s safe harbor explicitly bars reimbursement only when a school district makes a FAPE available by correctly identifying a child as having a disability and proposing an IEP adequate to meet the child's needs. The clause says nothing about the availability of reimbursement when a school district fails to provide a FAPE. Indeed, its statement that reimbursement *is not* authorized when a school district provides a FAPE could be read to indicate that reimbursement *is* authorized

—————

[7] The full text of §1412(a)(10)(C) is set forth in the Appendix, *infra*, at 18.

when a school district does not fulfill that obligation.

Clause (ii) likewise does not support the District's position. Because that clause is phrased permissively, stating only that courts "may require" reimbursement in those circumstances, it does not foreclose reimbursement awards in other circumstances. Together with clauses (iii) and (iv), clause (ii) is best read as elaborating on the general rule that courts may order reimbursement when a school district fails to provide a FAPE by listing factors that may affect a reimbursement award in the common situation in which a school district has provided a child with some special-education services and the child's parents believe those services are inadequate. Referring as they do to students who have previously received special-education services through a public school, clauses (ii) through (iv) are premised on a history of cooperation and together encourage school districts and parents to continue to cooperate in developing and implementing an appropriate IEP before resorting to a unilateral private placement.[8] The clauses of §1412(a)(10)(C) are thus best read as elucidative rather than exhaustive. Cf. *United*

———————

[8] The dissent asserts that, under this reading of the Act, "Congress has called for reducing reimbursement only for the most deserving . . . but provided no mechanism to reduce reimbursement to the least deserving." *Post*, at 6 (opinion of SOUTER, J.). In addition to making unsubstantiated generalizations about the desert of parents whose children have been denied public special-education services, the dissent grossly mischaracterizes our view of §1412(a)(10)(C). The fact that clause (iii) *permits* a court to reduce a reimbursement award when a parent whose child has previously received special-education services fails to give the school adequate notice of an intended private placement does not mean that it *prohibits* courts from similarly reducing the amount of reimbursement when a parent whose child has not previously received services fails to give such notice. Like clause (ii), clause (iii) provides guidance regarding the appropriateness of relief in a common factual scenario, and its instructions should not be understood to preclude courts and hearing officers from considering similar factors in other scenarios.

*States* v. *Atlantic Research Corp.*, 551 U. S. 128, 137 (2007) (noting that statutory language may "perfor[m] a significant function simply by clarifying" a provision's meaning).[9]

This reading of §1412(a)(10)(C) is necessary to avoid the conclusion that Congress abrogated *sub silentio* our decisions in *Burlington* and *Carter*. In those cases, we construed §1415(i)(2)(C)(iii) to authorize reimbursement when a school district fails to provide a FAPE and a child's private-school placement is appropriate, without regard to the child's prior receipt of services.[10] It would take more than Congress' failure to comment on the category of cases in which a child has not previously received special-education services for us to conclude that the Amendments substantially superseded our decisions and in large part

—————

[9] In arguing that §1412(a)(10)(C) is the exclusive source of authority for granting reimbursement awards to parents who unilaterally place a child in private school, the dissent neglects to explain that provision's failure to limit the type of private-school placements for which parents may be reimbursed. *School Comm. of Burlington* v. *Department of Ed. of Mass.* held that courts may grant reimbursement under §1415(i)(2)(C)(iii) only when a school district fails to provide a FAPE *and* the private-school placement is appropriate. See 471 U. S. 359, 369 (1985); see *Florence County School Dist. Four* v. *Carter*, 510 U. S. 7, 12–13 (1993). The latter requirement is essential to ensuring that reimbursement awards are granted only when such relief furthers the purposes of the Act. See *Burlington*, 471 U. S., at 369. That §1412(a)(10)(C) did not codify that requirement further indicates that Congress did not intend that provision to supplant §1415(i)(2)(C)(iii) as the sole authority on reimbursement awards but rather meant to augment the latter provision and our decisions construing it.

[10] As discussed above, although the children in *Burlington* and *Carter* had previously received special-education services in public school, our decisions in no way depended on their prior receipt of services. Those holdings rested instead on the breadth of the authority conferred by §1415(i)(2)(C)(iii), the interest in providing relief consistent with the Act's purpose, and the injustice that a contrary reading would produce, see *Burlington*, 471 U. S., at 369–370; see also *Carter*, 510 U. S., at 12–14—considerations that were not altered by the 1997 Amendments.

repealed §1415(i)(2)(C)(iii).    See *Branch* v. *Smith*, 538
U. S. 254, 273 (2003) ("[A]bsent a clearly expressed con-
gressional intention, repeals by implication are not fa-
vored" (internal quotation marks and citation omitted)).[11]
We accordingly adopt the reading of §1412(a)(10)(C) that
is consistent with those decisions.[12]

   The School District's reading of §1412(a)(10)(C) is also
at odds with the general remedial purpose underlying
IDEA and the 1997 Amendments.   The express purpose of
the Act is to "ensure that all children with disabilities
have available to them a free appropriate public education

-----------------

   [11] For the same reason, we reject the District's argument that because
§1412(a)(10)(C)(ii) authorizes "a court or a hearing officer" to award
reimbursement for private-school tuition, whereas §1415(i)(2)(C)(iii)
only provides a general grant of remedial authority to "court[s]," the
latter section cannot be read to authorize hearing officers to award
reimbursement.  That argument ignores our decision in *Burlington*, 471
U. S., at 363, 370, which interpreted §1415(i)(2)(C)(iii) to authorize
hearing officers as well as courts to award reimbursement notwith-
standing the provision's silence with regard to hearing officers.  When
Congress amended IDEA without altering the text of §1415(i)(2)(C)(iii),
it implicitly adopted that construction of the statute.  See *Lorillard* v.
*Pons*, 434 U. S. 575, 580–581 (1978).

   [12] Looking to the Amendments' legislative history for support, the
School District cites two House and Senate Reports that essentially
restate the text of §1412(a)(10)(C)(ii), H. R. Rep. No. 105–95, pp. 92–93
(1997); S. Rep. No. 105–17, p. 13 (1997), and a floor statement by
Representative Mike Castle, 143 Cong. Rec. 8013 (1997) (stating that
the "bill makes it harder for parents to unilaterally place a child in elite
private schools at public taxpayer expense, lowering costs to local
school districts").  Those ambiguous references do not undermine the
meaning that we discern from the statute's language and context.

   Notably, the agency charged with implementing IDEA has adopted
respondent's reading of the statute.  In commentary to regulations
implementing the 1997 Amendments, the Department of Education
stated that "hearing officers and courts retain their authority, recog-
nized in *Burlington* . . . to award 'appropriate' relief if a public agency
has failed to provide FAPE, including reimbursement . . . in instances
in which the child has not yet received special education and related
services." 64 Fed. Reg. 12602 (1999); see 71 Fed. Reg. 46599 (2006).

that emphasizes special education and related services designed to meet their unique needs," §1400(d)(1)(A)—a factor we took into account in construing the scope of §1415(i)(2)(C)(iii), see *Burlington*, 471 U. S., at 369. Without the remedy respondent seeks, a "child's right to a *free* appropriate education . . . would be less than complete." *Id.*, at 370. The District's position similarly conflicts with IDEA's "child find" requirement, pursuant to which States are obligated to "identif[y], locat[e], and evaluat[e]" "[a]ll children with disabilities residing in the State" to ensure that they receive needed special-education services. §1412(a)(3)(A); see §1412(a)(10)(A)(ii). A reading of the Act that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services.

Indeed, by immunizing a school district's refusal to find a child eligible for special-education services no matter how compelling the child's need, the School District's interpretation of §1412(a)(10)(C) would produce a rule bordering on the irrational. It would be particularly strange for the Act to provide a remedy, as all agree it does, when a school district offers a child inadequate special-education services but to leave parents without relief in the more egregious situation in which the school district unreasonably denies a child access to such services altogether. That IDEA affords parents substantial procedural safeguards, including the right to challenge a school district's eligibility determination and obtain prospective relief, see *post*, at 11, is no answer. We roundly rejected that argument in *Burlington*, observing that the "review process is ponderous" and therefore inadequate to ensure that a school's failure to provide a FAPE is remedied with the speed necessary to avoid detriment to the child's education. 471 U. S., at 370. Like *Burlington*, see *ibid.*, this

case vividly demonstrates the problem of delay, as respondent's parents first sought a due process hearing in April 2003, and the District Court issued its decision in May 2005—almost a year after respondent graduated from high school. The dissent all but ignores these shortcomings of IDEA's procedural safeguards.

## IV

The School District advances two additional arguments for reading the Act to foreclose reimbursement in this case. First, the District contends that because IDEA was an exercise of Congress' authority under the Spending Clause, U. S. Const., Art. I, §8, cl. 1, any conditions attached to a State's acceptance of funds must be stated unambiguously. See *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). Applying that principle, we held in *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 304 (2006), that IDEA's fee-shifting provision, §1415(i)(3)(B), does not authorize courts to award expert-services fees to prevailing parents in IDEA actions because the Act does not put States on notice of the possibility of such awards. But *Arlington* is readily distinguishable from this case. In accepting IDEA funding, States expressly agree to provide a FAPE to all children with disabilities. See §1412(a)(1)(A). An order awarding reimbursement of private-education costs when a school district fails to provide a FAPE merely requires the district "to belatedly pay expenses that it should have paid all along." *Burlington*, 471 U. S., at 370–371. And States have in any event been on notice at least since our decision in *Burlington* that IDEA authorizes courts to order reimbursement of the costs of private special-education services in appropriate circumstances. *Pennhurst*'s notice requirement is thus clearly satisfied.

Finally, the District urges that respondent's reading of the Act will impose a substantial financial burden on

public school districts and encourage parents to immediately enroll their children in private school without first endeavoring to cooperate with the school district. The dissent echoes this concern. See *post*, at 10. For several reasons, those fears are unfounded. Parents "are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act." *Carter*, 510 U. S., at 15. And even then courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school. In considering the equities, courts should generally presume that public-school officials are properly performing their obligations under IDEA. See *Schaffer* v. *Weast*, 546 U. S. 49, 62–63 (2005) (STEVENS, J., concurring). As a result of these criteria and the fact that parents who "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk,'" *Carter*, 510 U. S., at 15 (quoting *Burlington*, 471 U. S., at 373–374), the incidence of private-school placement at public expense is quite small, see Brief for National Disability Rights Network et al. as *Amici Curiae* 13–14.

## V

The IDEA Amendments of 1997 did not modify the text of §1415(i)(2)(C)(iii), and we do not read §1412(a)(10)(C) to alter that provision's meaning. Consistent with our decisions in *Burlington* and *Carter*, we conclude that IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special education or related services through the public school.

When a court or hearing officer concludes that a school district failed to provide a FAPE and the private placement was suitable, it must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted. As the Court of Appeals noted, the District Court did not properly consider the equities in this case and will need to undertake that analysis on remand. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

APPENDIX

Title 20 U. S. C. §1412(a)(10)(C) provides:

"(C) Payment for education of children enrolled in private schools without consent of or referral by the public agency

"(i) In general

"Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

"(ii) Reimbursement for private school placement

"If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

"(iii) Limitation on reimbursement

"The cost of reimbursement described in clause (ii) may be reduced or denied—

"(I) if—

"(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their

Appendix to opinion of the Court

child in a private school at public expense; or

"(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

"(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

"(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents."

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–305

_____

FOREST GROVE SCHOOL DISTRICT, PETITIONER
*v.* T. A.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2009]

JUSTICE SOUTER, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

I respectfully dissent.

*School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359 (1985), held that the Education of the Handicapped Act, 84 Stat. 175, now known as the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. §1400 *et seq.,* authorized a district court to order reimbursement of private school tuition and expenses to parents who took their disabled child from public school because the school's special education services did not meet the child's needs. We said that, for want of any specific limitation, this remedy was within the general authorization for courts to award "such relief as [they] determin[e] is appropriate." §1415(e)(2) (1982 ed.) (now codified at §1415(i)(2)(C)(iii) (2006 ed.)). In 1997, however, Congress amended the IDEA with a number of provisions explicitly addressing the issue of "[p]ayment for education of children enrolled in private schools without consent of or referral by the public agency." §1412(a)(10)(C). These amendments generally prohibit reimbursement if the school district made a "free appropriate public education" (FAPE) available, §1412(a)(10)(C)(i), and if they are to have any effect, there is no exception except by agreement, §1412(a)(10)(B), or for a student who previously received

special education services that were inadequate, §1412(a)(10)(C)(ii).

The majority says otherwise and holds that §1412(a)(10)(C)(ii) places no limit on reimbursements for private tuition. The Court does not find the provision clear enough to affect the rule in *Burlington*, and it does not believe Congress meant to limit public reimbursement for unilaterally incurred private school tuition. But there is no authority for a heightened standard before Congress can alter a prior judicial interpretation of a statute, and the assessment of congressional policy aims falls short of trumping what seems to me to be the clear limitation imposed by §1412(a)(10)(C)(ii).

I

In *Burlington*, parents of a child with a learning disability tried for over eight years to work out a satisfactory individualized education plan (IEP) for their son. 471 U. S., at 361–362. They eventually gave up and sent the boy to a private school for disabled children, *id.*, at 362, and we took the ensuing case to decide whether the Education of the Handicapped Act authorized courts to order reimbursement for private special education "if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act," *id.*, at 369. After noting various sections that "emphasiz[e] the participation of the parents in developing the child's [public] educational program," *id.*, at 368, we inferred that the Act authorized reimbursement by providing that a district court shall "'grant such relief as [it] determines is appropriate,'" *id.*, at 369 (quoting what is now §1415(i)(2)(C)(iii); alteration in original). We emphasized that the Act did not speak specifically to the issue of reimbursement, and held that "[a]bsent other reference," reimbursement for private tuition and expenses would be an "'appropriate'" remedy

in light of the purposes of the Act. *Id.*, at 369–370. In short, we read the general provision for ordering equitable remedies in §1415(i)(2)(C)(iii) as authorizing a reimbursement order, in large part because Congress had not spoken more specifically to the issue.

But Congress did speak explicitly when it amended the IDEA in 1997. It first said that whenever the State or a local educational agency refers a student to private special education, the bill is a public expense. See 20 U. S. C. §1412(a)(10)(B). It then included several clauses addressing "[p]ayment for education of children enrolled in private schools without consent of or referral by the public agency." §1412(a)(10)(C). The first contrasts with the provision covering an agency referral:

> "(i) In general
>
> ". . . this subchapter does not require a local educational agency to pay for the cost of education . . . of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." §1412(a)(10)(C).

The second clause covers the case in which the school authority failed to make a FAPE available in its schools. It does not, however, provide simply that the authority must pay in this case, no matter what. Instead it provides this:

> "(ii) Reimbursement for private school placement
>
> "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the

agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." §1412(a)(10)(C).

Two additional clauses spell out in some detail various facts upon which the reimbursement described in clause (ii) may be "reduced or denied." See §§1412(a)(10)(C)(iii) and (iv).

As a purely semantic matter, these provisions are ambiguous in their silence about the case with no previous special education services and no FAPE available. As the majority suggests, *ante*, at 10–11, clause (i) could theoretically be understood to imply that reimbursement may be ordered whenever a school district fails to provide a FAPE, and clause (ii) could be read as merely taking care to mention one of a variety of circumstances in which such reimbursement is permitted. But this is overstretching. When permissive language covers a special case, the natural sense of it is taken to prohibit what it fails to authorize. When a mother tells a boy that he may go out and play after his homework is done, he knows what she means.

So does anyone who reads the authorization of a reimbursement order in the case of "a child with a disability, who previously received special education and related services under the authority of a public agency." §1412(a)(10)(C)(ii).[1] If the mother did not mean that the

_____

[1] Likewise, no one is unsure whether this Court's Rule 18.6, which states, "Within 30 days after the case is placed on this Court's docket, the appellee may file a motion to dismiss . . . ," allows for a motion to dismiss after 30 days. See also *Carlisle* v. *United States*, 517 U. S. 416, 431–32 (1996) (listing numerous examples of permissive statements, such as then Federal Rule of Criminal Procedure 17(d)'s statement that a subpoena "may be served" by a person "who is not less than 18 years of age," that plainly carry a restrictive meaning).

homework had to be done, why did she mention it at all, and if Congress did not mean to restrict reimbursement authority by reference to previous receipt of services, why did it even raise the subject? "[O]ne of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Corley* v. *United States*, 556 U. S. ___, ___ (2009) (slip op., at 9) (internal quotation marks omitted). But not on the Court's reading, under which clause (ii) does nothing but describe a particular subset of cases subject to remedial authority already given to courts by §1415(i)(2)(C)(iii) and recognized in *Burlington:* a court may order reimbursement for a child who previously received special education related services, but it may do this for any other child, too.[2] But this is just not plausible, the notion that Congress added a new provision to the IDEA entitled "Reimbursement for private school placement" that had no effect whatsoever on reimbursement for private school placement. I would read clause (i) as written on the assumption that the school authorities can be expected to honor their obligations and as stating the general rule that unilateral placement cannot be reimbursed. See §1412(a)(10)(C)(i) ("In general . . . "). And I would read clause (ii) as imposing a receipt of prior ser-

_____

[2] The majority says that "clause (ii) is best read as elaborating on the general rule that courts may order reimbursement when a school district fails to provide a FAPE by listing factors that may affect a reimbursement award in the common situation in which a school district has provided a child with some special-education services and the child's parents believe those services are inadequate." *Ante*, at 11. But this is just another way of reading the provision off the books. On the majority's reading, clause (ii) states only that a court may award reimbursement when (1) there is a previous receipt of special education services and (2) a failure to provide a FAPE. Such a description of the most common subset of a category already described may be called elaboration, but it still has no effect on the statutory scheme.

vices limit on any exceptions to that general rule when school officials fall short of providing a FAPE. See §1412(a)(10)(C)(ii) ("Reimbursement for private school placement . . . ").

This reading can claim the virtue of avoiding a further anomaly. Section 1412(a)(10)(C)(iii), which limits otherwise available reimbursement, is expressly directed to "[t]he cost of reimbursement described in clause (ii)." This makes perfect sense under my reading. Since clause (ii) is now the exclusive source of authority to order reimbursement, it is natural to refer to it in the clause setting out the conditions for reducing or even denying reimbursement otherwise authorized. Yet, as T. A. and the Government concede, Brief for Respondent 22; Brief for United States as *Amicus Curiae* 4, 17, under the majority's reading, Congress has called for reducing reimbursement only for the most deserving (parents described in clause (ii) who consult with the school district and give public special education services a try before demanding payment for private education), but provided no mechanism to reduce reimbursement to the least deserving (parents who have not given public placement a chance).

The Court responds to this point by doubling down. According to the majority, the criteria listed in clause (iii) can justify a reduction not only of "reimbursement described in clause (ii)," §1412(a)(10)(C)(iii), but can also do so for a reimbursement order authorized elsewhere as well, *ante*, at 11 n. 8. That is, the majority avoids ascribing perverse motives to Congress by concluding that in both clause (ii) and clause (iii), Congress meant to add nothing to the statutory scheme. This simply leads back to the question of why Congress in §1412(a)(10)(C) would have been so concerned with cases in which children had not previously received special education services when, on the majority's reading, the prior receipt of services has no relevance whatsoever to the subject of that provision.

Because any other interpretation would render clause (ii) pointless and clause (iii) either pointless or perverse, §1412(a)(10)(C)(ii) must be read to allow reimbursement only for "parents of a child with a disability, who previously received special education and related services under the authority of a public agency."

## II

Neither the majority's clear statement rule nor its policy considerations prevail over the better view of the 1997 Amendments.

## A

The majority says that, because of our previous interpretation of the Act as authorizing reimbursement for unilateral private placement, Congress was obliged to speak with added clarity to alter the statute as so understood. *Ante*, at 8–12. The majority refers to two distinct principles for support: first, statutes are to be read with a presumption against implied repeals, *e.g., ante*, at 12–13 (citing *Branch* v. *Smith*, 538 U. S. 254, 273 (2003) (plurality opinion)), and second, congressional reenactment of statutory text without change is deemed to ratify a prior judicial interpretation of it, *e.g., ante,* at 8–9 (citing *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978)). I think neither principle is up to the task.

Section 1412(a)(10)(C) in no way repealed the provision we considered in *Burlington*.[3] The relief that "is appropriate" under §1415(i)(2)(C)(iii) depends on the substantive provisions of the IDEA as surely as if the provision author-

---

[3] The presumption against implied repeals would not justify reading the later provision as useless even if it applied since, when two provisions are irreconcilable, the presumption against implied repeals gives way to the later enactment. See *Branch* v. *Smith*, 538 U. S. 254, 273 (2003) (plurality opinion).

ized equitable relief "consistent with the provisions of this statute."[4]  When we applied §1415(i)(2)(C)(iii) in *Burlington*, we expressly referred to those provisions and concluded that, in the absence of a specific rule, "appropriate" relief included the reimbursement sought.  By introducing new restrictions on reimbursement, the 1997 Amendments produce a different conclusion about what relief is "appropriate."  But §1415(i)(2)(C)(iii) remains in effect, just as it would remain in effect if Congress had explicitly amended the IDEA to prohibit reimbursement absent prior receipt of services.

As for the rule that reenactment incorporates prior interpretation, the Court's reliance on it to preserve *Burlington*'s reading of §1415(i)(2)(C)(iii) faces two hurdles. First, so far as I can tell, this maxim has never been used to impose a clear statement rule.  If Congress does not suggest otherwise, reenacted statutory language retains its old meaning; but when a new enactment includes language undermining the prior reading, there is no presumption favoring the old, and the only course open is simply to read the revised statute as a whole.  This is so because there is no reason to distinguish between amendments that occur in a single clause (as if Congress had placed all the changes in §1415(i)(2)(C)(iii)), and those that take the form of a separate section (here, §1412(a)(10)(C)). If Congress had added a caveat within §1415(i)(2)(C)(iii), or in an immediately neighboring provision, I assume the majority would not approach it with skepticism on the ground that it purported to modify a prior judicial interpretation.

Second, nothing in my reading of §1412(a)(10)(C)(ii) is

—————

[4] No one, for example, would suggest that a court could grant reimbursement under §1415(i)(2)(C)(iii) to parents of a nondisabled child, but this is obvious only because we assume §1415(i)(2)(C)(iii) is to be read in light of the substantive provisions of the statute.

inconsistent with the holdings of *Burlington* and the other prior decision on the subject, *Florence County School Dist. Four* v. *Carter*, 510 U. S. 7 (1993). Our opinion in *Burlington* was expressly premised on there being no "other reference" that would govern reimbursement for private tuition, 471 U. S., at 369, and this all but invited Congress to provide one. Congress's provision of such a reference in 1997 is, to say the very least, no reason for skepticism that Congress wished to alter the law on reimbursement. The 1997 legislation, read my way, would not, however, alter the result in either *Burlington* or *Carter*. In each case, the school district had agreed that the child was disabled, the parents had cooperated with the district and tried out an IEP, and the only question was whether parents who later resorted to a private school could be reimbursed "'if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act.'" *Carter*, *supra*, at 12 (quoting *Burlington*, *supra*, at 369). In ordering reimbursement, the Court in both *Burlington* and *Carter* emphasized that the parents took part in devising an IEP, 471 U. S., at 368; 510 U. S., at 12, and expressed concern for parents who had sought an IEP before placing their child in private school, but received one that was inadequate, 471 U. S., at 370; 510 U. S., at 12. The result in each case would have been the same under my reading of the amended Act, both sets of parents being "parents of a child with a disability, who previously received special education and related services under the authority of a public agency." §1412(a)(10)(C)(ii). It is therefore too much to suggest that my reading of §1412(a)(10)(C)(ii) would "abrogat[e] *sub silentio* our decisions in *Burlington* and *Carter*," *ante*, at 12.

The majority argues that the policy concerns vindicated in *Burlington* and *Carter* justify reading those cases to authorize a reimbursement authority going beyond their facts, *ante,* at 7–8, and would hold reimbursement possible

even for parents who, like those here, unilaterally resort to a private school without first establishing at the administrative or appellate level that the child is disabled, or engaging in a collaborative process with the school officials. But how broadly one should read *Burlington* and *Carter* is beside the point, Congress having explicitly addressed the subject with statutory language that precludes the Court's result today.

## B

The Court also rejects the natural sense of §1412(a)(10)(C) as an interpretation that would be "at odds with the general remedial purpose underlying IDEA and the 1997 Amendments." *Ante*, at 13. The majority thinks my reading would place the school authorities in total control of parents' eligibility for reimbursement: just refuse any request for special education or services in the public school, and the prior service condition for eligibility under clause (ii) can never be satisfied. Thus, as the majority puts it, it would "borde[r] on the irrational" to "immuniz[e] a school district's refusal to find a child eligible for special-education services no matter how compelling the child's need." *Ibid.* I agree that any such scheme would be pretty absurd, but there is no absurdity here. The majority's suggestion overlooks the terms of the IDEA process, the substantial procedures protecting a child's substantive rights under the IDEA, and the significant costs of its rule.

To start with the costs, special education can be immensely expensive, amounting to tens of billions of dollars annually and as much as 20% of public schools' general operating budgets. See Brief for Council of the Great City Schools as *Amicus Curiae* 22–23. The more private placement there is, the higher the special education bill, a fact that lends urgency to the IDEA's mandate of a collaborative process in which an IEP is "developed jointly by

a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child." *Burlington*, *supra*, at 368.

The Act's repeated emphasis on the need for cooperative joint action by school and parent does not, however, leave the school in control if officials should wish to block effective (and expensive) action for the child's benefit, for if the collaborative approach breaks down, the IDEA provides for quick review in a "due process hearing" of the parents' claim that more services are needed to provide a FAPE than the school is willing to give. See §1415(c)(2) (district must respond to due process hearing complaint within 10 days and hearing officer must assess facial validity of complaint within 5 days); §1415(e) (mediation is available, provided it does not delay due process hearing); §1415(f)(1)(B) (district must convene a meeting with parents within 15 days to attempt to resolve complaint); 34 CFR §§300.510(b)(1)–(2) (2008) (if complaint is not resolved, a hearing must be held within 30 days of complaint and a decision must be issued within 75 days of complaint). Parents who remain dissatisfied after these first two levels of process may have a right of appeal to the state educational agency and in any case may bring a court action in federal district court. See 20 U. S. C. §1415(i)(2). This scheme of administrative and judicial review is the answer to the Court's claim that reading the prior services condition as restrictive, not illustrative, immunizes a school district's intransigence, giving it an effective veto on reimbursement for private placement.[5]

_____

[5] The majority argues that we already rejected this process as inadequate in *School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359 (1985). *Ante*, at 14. That was before the enactment of §1412(a)(10)(C)(ii). The question in *Burlington* was whether the reimbursement there was an "appropriate" remedy under §1415(i)(2)(C)(iii). See 471 U. S., at 370. With no statement to the contrary from Congress, the Court expressed concern over the possible

That said, the Court of course has a fair point that the prior services condition qualifies the remedial objective of the statute, and pursuing appeals to get a satisfactory IEP with special services worth accepting could be discouraging. The child who needs help does not stop needing it, or stop growing, while schools and parents argue back and forth. But we have to decide this case on the premise that most such arguments will be carried on in good faith, and even on the assumption that disagreements about the adequacy of IEPs will impose some burdens on the Act's intended beneficiaries, there is still a persuasive reason for Congress to have written the statute to mandate just what my interpretation requires. Given the burden of private school placement, it makes good sense to require parents to try to devise a satisfactory alternative within the public schools, by taking part in the collaborative process of developing an IEP that is the "*modus operandi*" of the IDEA. *Burlington*, 471 U. S., at 368. And if some time, and some educational opportunity, is lost in consequence, this only shows what we have realized before, that no policy is ever pursued to the ultimate, single-minded limit, and that "[t]he IDEA obviously does not seek to promote [its] goals at the expense of all considerations, including fiscal considerations," *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 303 (2006).[6]

––––––––

length of the IDEA review process and surmised that Congress would have intended for reimbursement to be authorized. *Ibid.* But Congress provided a statement to the contrary in 1997; the only reading that gives effect to §1412(a)(10)(C)(ii) is that reimbursement is not permitted absent prior placement, and the only question for the Court now is whether Congress could have meant what it said.

[6] See 143 Cong. Rec. 8013 (1997) (statement of Rep. Castle) ("This law . . . has had unintended and costly consequences. . . . It has resulted in school districts unnecessarily paying expensive private school tuition for children. It has resulted in cases where lawyers have gamed the system to the detriment of schools and children." "This bill makes it harder for parents to unilaterally place a child in elite private schools at public taxpayer expense, lowering costs to local school districts").