Opinion by Judge FISHER; Partial Concurrence and Partial Dissent by Judge BYBEE.
OPINION
FISHER, Circuit Judge:
At trial on the charge of attempted illegal reentry into the United States, Omar Argueta-Rosales presented evidence that he crossed into the United States in a delusional state, believing he was being chased by Mexican gangs, and with the specific intent solely to place .himself into the protective custody of United States officials. The district court found this evidence plausible, but nonetheless found Ar-gueta guilty of the charged offense, ruling the mens rea element of attempted illegal reentry under 8 U.S.C. § 1326 requires the government to prove only that the defendant knew he was crossing into the United' States and that he was not privileged to do so. In United States v. Lombera-Valdovinos, 429 F.3d 927, 928 (9th Cir.2005), however, we held it was “[im]posSible to convict a previously deported alien for attempted illegal reentry into'the United States under 8 U.S.C. §" 1326 when he crosses the border with the intent only to be imprisonéd ..,; because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint.” Because the district court found Argueta guilty under an erroneous legal standard, we vacate his conviction and remand for a new trial or other proceedings consistent with this opinion.
I
Omar. Argueta-Rosales was born in Mexico in 1981. When he was five, his mother migrated to the United States and he was left to the care of his grandparents in Mexico. He lived with his grandparents for four years before reuniting with his *1152 mother in Los Angeles, California. He lived with his mother in Los Angeles until he was 16 years old. An immigration judge ordered him removed in 2006.
In 2010, Argueta was apprehended at the border while attempting to unlawfully return to the United States. In 2011, he pled guilty to attempting to illegally reenter the United States, in violation of 8 U.S.C. § 1326, and received a sentence of five years’ probation. A standard term of his probation provided he “shall not commit another federal, state, or local crime.”
After returning to Mexico, Argueta began to abuse methamphetamine. A few days before the border crossing that is the subject of this appeal, he was beaten by gang, members in Mexico. In the days that followed, according to Dr. Bruce Ya-nofsky, the court-appointed psychologist who testified at trial, Argueta became “increasingly paranoid, he was worried, he started to see people that were following him and was really concerned about his life.”
[H]e was living out on the streets, running around until he got to the point where he felt that his life was in danger and then obviously ... proceeded to try to cross the border with the account that he gave me that he had the cell phone, that it was a land line — well, it was connected to a line in the United States, he was trying to call for help, he was calling 9-1-1 repeatedly because he wanted law enforcement to intervene because he had tried the Mexican law enforcement to help him and they didn’t do anything for him. So in this state of panic, paranoia, and just losing control of what was going on in his life, fearing for his life, he ended up in-the border.
No cell phone was found on Argueta’s person at the time of his arrest, however.
Argueta crossed the United States border from Mexico, about one and one-half miles west of the San Ysidro, California, port of entry, on November 29, 2013. At the border, Argueta climbed over the approximately 10-foot primary fence, which placed him in the United States. He was at that point between the primary fence and the secondary fence, which is approximately 50 yards north of the primary fence and about 20 feet high. Argueta was spotted by Border Patrol Agent Oscar Alvarado when Argueta was approximately 15 yards north of the primary fence. Argue-ta was walking, at a normal speed, in a north and westbound direction. Agent Alvarado radioed another officer to intercept Argueta.
Border Patrol Agent Jeffrey Schwinn responded. Agent Schwinn approached in his vehicle to approximately 20 feet away, exited his vehicle and shouted “Hey” to try to get Argueta’s attention. When Argueta did not respond, Agent Schwinn approached Argueta. Argueta turned around and looked at Schwinn, at which point Schwinn asked him in Spanish where he was born. Argueta said Mexico City. Schwinn asked Argueta what country he was a citizen of, and he said Mexico, so Schwinn proceeded to ask him if he had any immigration documents allowing him to enter the United States, and he said no. At that point, Argueta began to walk towards Schwinn, and Schwinn told him to head back south and return to Mexico. When Argueta did not take that suggestion, Agent Schwinn told him he was going to place him under arrest, and Argueta said something to the effect of “you do what you got to do.”
About two hours after his arrest, two border patrol agents interviewed Argueta at the Imperial Beach Border Patrol Station in San Diego. During the beginning of the interview, which was conducted in English, Argueta appeared calm and rational. Early in the interview, Argueta *1153 asked to make a statement, saying “[i]t’s important. It relates to what happened at my house.” One of the agents told Argue-ta he would be able to make a statement later. At one point during the interview, one of the agents asked Argueta, “When did you last enter the United States,” and this discussion followed:
A. Last was five years ago. Five years ago, almost five and a half.
Q. How did you enter the United States?
A. Trying to go through the line walking.
Q. Through where?
A. I was walking through Calexico, from Mexicali to Calexico.
Q. The port of entry?
A. Exactly.
Q. What is your destination in the United States, city and state?
A. Los Angeles, California.
Q. Do you have any ... fear of persecution or torture should you be removed from the United States?
A. Yes, I do.
The agents did not follow up on Argueta’s claim of persecution.
Toward the .end of the interview, when the agents asked Argueta whether he wanted to say anything else, Argueta made apparently delusional statements for two minutes, referring to people who were in the cell with him even though the only people there were Argueta’ and the two border patrol agents:
A. Just that I come — the people who I’m with' right now in the tank are the people who were at my house.
Q. In here in the cell?
A. (Inaudible.) And also, I wanted to ask you guys if it’s coincidental or (unintelligible). And that’s when one of the (unintelligible) started asking me what’s up. I told them I noticed I recognize the skinny guy, the one they put at the end. (Unintelligible) the other one with white shorts (unintelligible). He started taking his hand out. Before that I told the skinny dude, hey, I know you, bro. It hurts me, because that’s my wife, you know.
But then again, Í don’t know what’s going on. Like I said, I was going nuts over there. I couldn’t remember. I had to ask my wife. I mean, there’s some pictures I seen. I can’t recognize certain people (unintelligible). I was going through it and not only (unintelligible) that’s the .people that áre after me. (Unintelligible.)'
In February 2014, Argueta was charged with attempting to reenter the United States, in violation of 8 U.S.C, §: 1326(a) and (b).[1] He was separately charged with violating the terms of his 2011 probation. The district court appointed Dr. Yanofsky *1154 to determine whether Argueta was competent to stand trial.. After Argueta was found competent, the case proceeded to a bench trial. At trial, Dr. Yanofsky testified that, on the day Argueta climbed over the border fence, he was suffering from a substance-induced' psychosis caused by heavy methamphetamine use. According to Dr. Yanofsky, Argueta was operating under a delusion that individuals were chasing-him and trying to Mil him, prompting him to climb over the border fence. An expert proffered by the government, Dr. Mark Kalish, disagreed with Dr. Ya-nofsky’s conclusion that Argueta was suffering from substance-induced psychosis.
At the close of evidence, the parties presented closing arguments to the district court. The elements of the crime of attempted illegal reentry under § 1326 are: “(1) the defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or'removed from the United States; and (5)' the Attorney General had not consented'to the defendant’s attempted reentry.” United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1196 (9th Cir.2000) (en banc).
Here,. only the first element was in dispute. Relying on United States v. Lombera-Valdovinos, 429 F.3d 927 (9th Cir.2005), Argueta’s counsel argued “the government cannot prove specific intent beyond a reasonable doubt because the evidence in this case showed that -Mr. Argueta entered the United States under the psychotic belief that he was being chased by armed gunmen in Mexico, but he specifically — while that may be the motive, he specifically intended to enter to find protection” by turning himself in to the border patrol. According to Ar-gueta’s counsel, Argueta was not guilty of the crime of attempted illegal reentry if the evidence showed that his “specific intent ... was to go into custody.” Counsel maintained that, under Lomb-erar-Valdovinos, “if someone specifically intends to enter the United States to go into custody, they’re affirmatively not guilty under the attempted reentry charge of [§ ] 1326.”
The district court rejected Argueta’s argument. In the court’s view, the specific intent element of attempted illegal entry would be satisfied so long as Argueta “knew he was vaulting the fence into the United States and he knew that that was wrong.” The court rejected the proposition that Argueta could negate the specific intent element merely by showing he intended to enter into custody, • disagreeing with Argueta’s argument that “the reason of coming over here to turn yourself in is enough to defeat conscious purpose.” According to the court, if the defense was “right that the desire to turn yourself in, even if it’s based on a delusion, is enough to defeat conscious purpose, the' appellate court will tell us. I don’t think it is.”
Having rejected Argueta’s legal argument, the court proceeded to find the specific intent element proven beyond a reasonable doubt because Argueta (1) knew he was crossing into the United States and (2) knew he did not have permission to do so, facts Argueta did not dispute. Accordingly, the court found Argueta guilty of the crime of attempted illegal reentry. In addition; solely on the basis of that conviction, the court also found Argueta guilty of violating the terms of his 2011 probation. The court later sentenced Argueta to 21 months in custody on the attempted illegal reentry conviction and an additional 12 *1155 months in custody on the probation violation, to be followed by three years of supervised release. Argueta timely appealed both judgments, and the two appeals have been consolidated in this court..
II
Conclusions of law following a bench trial are reviewed de novo. See Oswalt v. Resolute Indus., Inc., 642 F.3d 856, 859 (9th Cir.2011); cf. United States v. Knapp, 120 F.3d 928, 930 (9th Cir.1997) (“If a jury instruction misstates elements of a statutory crime, the standard of review is ... de novo.”).
III
A
This case is controlled by Lomberar-Val-dovinos, where we held it was “[imjpossi-ble to convict a previously deported alien for attempted illegal reentry into the United States under 8 U.S.C. § 1326 when he crosses the border with the intent only to be imprisoned ..., because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint.” 429 F.3d at 928.
In Lombera-Valdovinos, a border patrol agent was patrolling the border between the United States and Mexico, sitting in a marked border patrol vehicle between the primary fence, which marks the actual border, and the secondary fence, located about 100 feet north of the primary fence. See id. With binoculars, the agent saw the defendant and four or five others standing on the Mexico side of the border, about 200 yards away from the agent. See id. The agent then looked away for about 15 seconds; when he turned back, he saw the defendant, alone and now on the United States side of the primary fence, walking directly toward him. See id. When the defendant continued to walk toward the agent, the agent drove toward him. See id. When they met, the defendant stated, “I want to see an immigration judge,” admitted to being a citizen of Mexico and, when asked if he had any legal basis for being present in the United States, answered “No.” Id. He also said he “wished to go back to jail.” Id. The agent then searched and arrested the defendant. See id.
Because the defendant had been deported before, he was charged with attempted illegal reentry, in violation of § 1326. See id. After a jury returned a guilty verdict, the defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. See id. at 927-28. The district court denied the motion, and the defendant, appealed. See id. Reviewing the evidence in the light most favorable to the government, we held that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See id. at 930.
We explained that, “for purposes of § 1326, ‘enter’ has a narrower meaning than its colloquial usage.” Id. at 928. “An alien has not entered the- United States under § 1326 unless he does so ‘free from official restraint.’ ” Id. (quoting Gracidas-Ulibarry, 231 F.3d at 1191 n. 3). Attempted illegal reentry, in turn, “requires proof of specific intent, more particularly the specific intent ‘to reenter without consent.’ ” Id. at 929 (citation omitted) (quoting United States v. Leos-Maldonado, 302 F.3d 1061, 1063 (9th Cir.2002)). Official restraint, we further explained,' “encompasses restraint by any government official,” not just officials of the Department of Homeland Security, Id.[2] Because all of *1156 the evidence showed “the defendant’s intent was to be taken into custody,” id. at 930 n. 3, we held that “nor rational trier of fact could conclude ... the defendant was guilty of the ■ specific intent crime of attempted illegal reentry,” id. at 930.
As the government now concedes, the district court misapplied Lomberar-Valdovinos here.[3] In order to convict Argueta, the government was required to prove beyond a reasonable doubt that Argueta crossed into the United States with the specific “intent to enter the country free from official restraint.” Id. at 928. It was not sufficient that Argueta knew he was crossing into the United States and knew he did not have permission to do so; If Afgueta’S sole “intent was to be taken into custody,” then “no rational trier of fact could conclude [he] was guilty of the specific intent crime of attempted illegal reentry.” Id. at 930 & n. 3. The district court’s verdict thus rested on an erroneous legal'standard.
B
When a district court in a bench trial has made a legal error regarding the elements of an offense, the error is reviewed using the same harmless error standard that would apply to. an erroneous jury instruction. See Wilson v. United States, 250 F.2d 312, 323-24 (9th Cir.1957). “An error in describing an element of the offense in a jury instruction is harmless only if - it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.” United States v. Liu, 731 F.3d 982, 992 (9th Cir.2013) (internal quotation marks omitted); see also United States v. Driggers, 559 F.3d 1021, 1025-26 (9th Cir.2009). Accordingly, the question here is whether it is clear beyond a reasonable doubt that the district court would have found Argueta guilty absent. the error. The government argues the district court’s error was harmless on two independent theories. We address them in turn, finding neither persuasive.
1
The government argues Lomberar-Val-dovinos applies only when there is no evidence of anything other than the intent to be taken into custody. In the government’s view, where, as here, there is substantial evidence of the defendant’s specific indent to enter the United States free from official restraint, Lombera-Valdovinos “is of no import,” even if there is also substantial evidence of the intent to enter into custody. We disagree, and take this opportunity to clarify Lombera-Valdovinos.
It is true that in Lomberar-Valdovinos we said “this case presents a rare set of factual circumstances where there is no evidence of anything other than the intent to be taken into custody.” 429 F.3d at 930 n. 3 (emphasis added). • We made that *1157 statement, however, in the course of reviewing the denial of the defendant’s Rule 29 motion for judgment of acquittal. See id. at 928, 930. Under that standard, we were required to affirm the defendant’s conviction so long as any rational trier of fact could have found he possessed the specific intent to enter fre'e from official restraint. See 'id. Thus, by pointing to the complete absence of contrary evidence, we were simply applying that highly deferential standard of review. We did not hold that any evidence of an unlawful intent would compel a conviction. We now clarify that where, as here, there is contradictory evidence regarding the defendant’s intent, it is for the trier of fact to determine whether the government has proven unlawful intent beyond a reasonable doubt. The government’s contention that Lomb-erar-Valdovinos is limited to cases in which there is no evidence of a specific intent to enter the United States free from official restraint is without merit. We reject the government’s argument the district court’s error was harmless on this ground.
That being said, we also clarify that the government need not prove that entry free from official restraint was the defendánt’s sole intent. The government must prove only that Argueta had a specific intent to enter the United States free from official restraint, not that this was his only purpose. See Lombera-Valdovinos, 429 F.3d at 928 (noting the defendant “cross[ed] the border with the intent only to be imprisoned” (emphasis added)); cf. United States v. Shabban, 612 F.3d 693, 696 & n. 1 (D.C.Cir.2010) (“As Shabban concedes, evidence that a defendant had multiple intentions does not mean there was insufficient evidence of the requisite statutory intent.”); United States v. Julian, 427 F.3d 471, 485 (7th Cir.2005), (“A defendant need not facilitate someone’s interstate or foreign travel with the sole or principal intent that he engage in prostitution in order to be liable under section 2421, so long as prostitution was a significant motive.”); United States v. Fairchild, 122 F.3d 605, 612 (8th Cir.1997) (holding that “only one of the [defendant’s] intentions must meet the elements of the offense”); 1 Wayne R. LaFave, Substantive Criminal Law § 5.2 (2d ed. 2Ó15) (“It may be said that, so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention.”). Similarly, if Argueta “actually intended to sneak into the country, and changed his plans only when he was spotted” by the border patrol, he again would be guilty. Lombera-Valdovinos, 429 F.3d at 930.
.2
In the alternative, the government contends the error was harmless because there was overwhelming evidence of ’Argueta’s intent to enter free from official restraint. We again disagree.
There was, to be sure, evidence that Argueta crossed the border with the specific intent to enter free from official restraint. He scaled a border fence in ah area in which, according to one border patrol agent’s testimony, there was a SO-SO chance of evading detection. If he had wanted to turn' himself in, he could have presented himself at the port of entry located less than two miles away. When he crossed into the United States, Argueta was walking away from Agent Alvarado rather than toward him. When Agent Schwinn' first shouted to Argueta, he did not stop. In his initial encounter with Agent Schwinn, Argueta did not say he was seeking "protective custody. When asked his destination during his post-arrest interview, Argueta identified Los An-geles.
*1158 Evidence also pointed in the other direction, however. Argueta crossed into the United States in broad daylight in a heavily patrolled area. When Agent Alvarado spotted him on the United States side of the primary fence, he was walking normally, not running. When he was confronted by Agent Schwinn, Argueta did not run. When Agent Schwinn offered Argueta the opportunity to climb the fence back into Mexico rather than being arrested, Argueta declined the offer — evidence fully consistent with Argueta’s contention that he crossed into the United States to enter protective custody. Dr. Yanofsky testified Argueta was under á drug-induced psychosis,' suffering from delusions, and had entered the United States to seek protection, testimony the district court credited. Argueta told Dr. Yanofsky he made numerous calls to 9-1-1 before reaching the United States border in a further attempt to obtain protection from United States authorities (although no phone was found on Argueta’s person when he was arrested). In his post-arrest interview, Argueta referred to people chasing him and said he was in fear of persecution and torture; and Argueta’s bizarre behavior at the post-arrest interview con,firmed his delusional state. Although Ar-gueta did not cross at the port of entry, the district court found this was consistent with Argueta’s perceptions of an immediate threat to this life. Although Argueta told the agents his destination was Los Angeles, he could have easily misunderstood this question in context as referring to .his earlier crossing into the United States.
, For these reasons, it is not clear beyond a reasonable doubt the district court would have found Argueta guilty absent its misapprehension of the specific intent element. The error therefore was not harmless.[4]
IV
In his concurring opinion, Judge Bybee' suggests our court should use this case as a vehicle to reconsider en banc three sets of circuit precedents: (1) our holdings in cases such as United States v. Oscar, 496 F.2d 492, 493-94 (9th Cir.1974), and United States v. Pacheco-Medina, 212 F.3d 1162, 1163-66 (9th Cir.2000), that, for immigration purposes, “entry” is a term of art that requires not only physical presence in the United States but also freedom from official restraint; (2) our holding in United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1193 (9th Cir.2000) (en banc), that attempted illegal reentry under 8 U.S.C. § 1326 is a specific intent crime; and (3) our holding in United States v. Lombera-Valdovinos, 429 F.3d 927, 929 (9th Cir.2005), that “official restraint” encompasses restraint by government officials other than those of the Department of Homeland Security (DHS). In our view, each of these precedents rests on a solid footing.
A
Judge Bybee would have us reconsider our. longstanding view that, for immigration purposes, “entry” is a term of art requiring not only physical presence in the United States but also freedom from official restraint. As Judge Bybee recognizes, this principle was established more than a century ago, see, e.g., Ex parte Chow Chok, *1159 161 F. 627, 628-31 (N.D.N.Y.), aff'd 163 F. 1021 (2d Cir.1908), and has long been recognized not only by this court but also by the Supreme Court, see Kaplan v. Tod, 267 U.S. 228, 230-31, 45 S.Ct. 257, 69 L.Ed. 585 (1925); United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, 49 L.Ed. 1040 (1905), other federal circuits, see, e.g., Dimova v. Holder, 783 F.3d 30, 39 (1st Cir.2015); Correa v. Thornburgh, 901 F.2d 1166, 1171-72 (2d Cir.1990); Parra-Rojas v. Att’y Gen. U.S., 747 F.3d 164, 170 (3d Cir.2014); United States v. Angeles-Mascote, 206 F.3d 529, 531 (5th Cir.2000); Vitale v. INS, 463 F.2d 579, 581-82 (7th Cir.1972); Nyirenda v. INS, 279 F.3d 620, 623 (8th Cir.2002), and the Board of Immigration Appeals, see, e.g., Matter of Martinez-Serrano, 25 I. & N. Dec. 151, 153 (BIA 2009); Matter of Pierre, 14 I. & N. Dec. 467, 468-69 (BIA 1973). Judge By-bee offers no persuasive justification for casting aside this longstanding and widely accepted understanding of what it means to enter the United States.
Judge Bybee perhaps believes this understanding of “entry” should be preserved for immigration purposes generally but should not apply to criminal immigration laws such as 8 U.S.C. §§ 1324, 1325 and 1326. Concurrence at 1165-66. Here again, however, Judge Bybee’s view? conflicts not 'only with the longstanding law of this court but also with the law of other circuits. See, e.g., United States v. Macias, 740 F.3d 96, 100 (2d Cir.2014); Angeles-Mascote, 206 F.3d at 531; United States v. Cardenas-Alvarez, 987 F.2d 1129, 1133 (5th Cir.1993); United States v. Kavazanjian, 623 F.2d 730, 736-37 (1st Cir.1980); United States v. Vasilatos, 209 F.2d 195, 197 (3d Cir.1954). We see no reason for adopting one meaning of entry for immigration purposes generally but a different meaning for criminal immigration laws, much less doing so to create a circuit split.
Indeed, there are at least two persuasive reasons for continuing to adhere to this longstanding and widely accepted doctrine. First, as Judge Bybee recounts, the doctrine has been around for decades, and, although Congress has amended the criminal immigration laws in the interim, it has never called into question or expressly overruled the firmly established judicial gloss on “entry.” As the Supreme Court has observed on many occasions, “Congress is presumed to be aware of an administrative or-judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.” Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239-40, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009) (quoting Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)); see, e.g., Hing Sum v. Holder, 602 F.3d 1092, 1100-01 & n. 8 (9th Cir.2010) (interpreting the word “admission” in § 1101(a)(13)(A) in light of existing BIÁ precedent requiring freedom from restraint).[5]
*1160 Second, the official restraint doctrine is a practical necessity. In its absence, mere physical presence in the United States, without permission, would give rise to criminal liability for illegal reentry under § 1326. See United States v. Barragan-Cepeda, 29 F.3d 1378, 1381 (9th Cir.1994) (listing the elements of § 1326). We doubt Congress intended to make criminals out of persons who, for any number of innocent reasons, approach immigration officials at the border. Because “in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation,” “freedom from official restraint must be added to physical presence before entry is accomplished.” Vasilatos, 209 F.2d at 197.
B
Judge Bybee also questions our holding in United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1190, 1196 (9th Cir.2000) (en banc), that attempted illegal reentry is a specific intent crime, citing four circuits that have rejected that proposition—United States v. Rodriguez, 416 F.3d 123, 125 (2d Cir.2005); United States v. Morales-Palacios, 369 F.3d 442, 445-49 (5th Cir.2004); United States v. Peralt-Reyes, 131 F.3d 956, 957 (11th Cir.1997); United States v. Reyes-Medina, 53 F.3d 327, 1995 WL 247343, at *1 (1st Cir.1995) (unpublished). Concurrence at 1168 & n. 5. All four of those cases, however, were decided before the Supreme Court’s decision in United States v. Resendiz-Ponce, 549 U.S. 102, 106-07, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007), which confirmed that the attempt prong of § 1326 incorporates the common law meaning of attempt, including an element requiring the specific intent to commit the underlying crime. Resendiz-Ponce confirms that Gracidas-Ulibarry was correctly decided.
C
Finally, Judge Bybee questions our holding in United States v. Lombera-Valdovinos, 429 F.3d 927, 929 (9th Cir.2005), that official restraint “encompasses restraint by any government official, not just officials of DHS,” the Department of Homeland Security. Concurrence at 1169. He contends official restraint has “always been limited to physical restraint or surveillance of an alien by a government officer operating at or just inside the border.” Concurrence at 1169.
Official restraint, however, “need not be by immigration officers,” Correa v. Thornburgh, 901 F.2d 1166, 1172 (2d Cir.1990); see, e.g., Zhang v. Slattery, 55 F.3d 732, 753, 755 (2d Cir.1995) (shipwrecked alien restrained by local police upon reaching shore), superseded by statute on other grounds as recognized in City of New York v. Permanent Mission of India to United Nations, 618 F.3d 172, 201 (2d Cir.2010); Edmond v. Nelson, 575 F.Supp. 532, 535 (E.D.La.1983) (aliens seeking entry by sea “restrained” by the master of a rescuing ship, acting pursuant to government regulations); Matter of Yam, 16 I. & N. Dec. 535, 536-37 (BIA 1978) (alien found at the border and taken under guard by local police to a medical facility), and it need not be at the border, see Kaplan v. Tod, 267 U.S. 228, 229, 45 S.Ct. 257 (1925) (holding a girl was under official restraint even though she was “handed over to the *1161 Hebrew. Sheltering and Immigrant Aid Society,” which in turn allowed her to live with her father).
The position Judge Bybee advances in his concurrence is contrary not only to this precedent but also to the position the government itself argued to us in Lomberar-Valdovinos, where the government expressly rejected the proposition that “only Department of Homeland Security restraint constitutes official restraint under section 1326.” The government argued there that “an alien is not deemed to have entered unless he is free to go at large” within- the United States, the very principle we followed in Lombera-Valdovinos. Judge Bybee, therefore, is seeking to relit-igate a rule of law the government expressly advocated for in Lomberar-Valdovi-nos — and which it has not asked us to reconsider now.
Nor has Judge Bybee suggested a rationale for criminalizing conduct such as that engaged in by the defendant in Lombera-Valdovinos. Lombera-Valdovinos crossed the border, walked directly up to a border control agent and asked to be taken into custody. He never sought to evade detection. He never sought the freedom to go at large within the United States. He neither sought nor “gained a foothold in the United States.” Kaplan, 267 U.S. at 230, 45 S.Ct. 257. We see no reason Congress would have intended § 1326 to reach such conduct.
Judge Bybee alternatively .suggests Lombera-Valdovinos■ should be reconsidered on a practical ground — because it would allow defendants to avoid liability for attempting to • reenter the United States by opportunistically asserting,, after detection, that they crossed into the country solely to be placed into official custody. Concurrence at 1170-71. He argues requiring the government to prove beyond a reasonable doubt that the defendant had the. specific intent to enter the United States free from official restraint imposes too great a burden on prosecutors.
This speculation seems unfounded. When a person is spotted by border patrol agents crossing into the United States, away from an official port of entry, this alone is compelling evidence that the person intends'to achieve not only physical presence in the United States but also freedom from official restraint. Cf. United States v. Quintana-Torres, 235 F.3d 1197, 1200 (9th Cir.2000) (noting an alien’s presence in the United States would provide convincing proof of the alien’s intention to be here unless adequately explained away, “much as a face covered by jam near a jam jar is convincing proof of jam-eating unless otherwise - explained”). Certainly there may be unusual cases ■ in which persons could be acquitted-of-attempted illegal reentry where, as in Lombera-Valdovinos, they cross the border,-walk directly up to a border control agent and ask to be taken into custody. But such cases present “a rare set of factual circumstances.” Lombera-Valdovinos, 429 F.3d at 930 n. 3. In the more than 10 years Lombera-Valdovinos has been on the books, it has not, to our knowledge, hindered effective prosecution of those who attempt to enter the United States unlawfully. Indeed, we are aware of only a single case-[1]-LomberaValdovinos itself — in which an individual has been acquitted on this ground.
V-
Because the district court applied an incorrect legal standard, we vacate Argue-ta’s conviction and sentence in No. 14-50384 and vacate the revocation of supervised ■ release and sentence in No. 14-50385. We remand for proceedings consistent with this opinion.
VACATED AND REMANDED.

. Section 1326(a) states:
(a) In general
Subject to subsection (b) of this section, any alien who—
(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien’s reapplying for admission; or (B) with respect to an alien previously denied admissipn and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act, shall be fined under Title 18, or imprisoned not more than 2 years, or both.
Section 1326(b) provides enhanced penalties for certain defendants.'

. At trial in Lombera-Valdovinos, the government argued "official restraint” encompassed *1156 only restraint by officials of the Department of Homeland Security (DHS), not other forms of official custody. See 429 F.3d at 929-30. In the ■ government’s view, if 'the' defendant crossed into the United States with the intent to go to jail, then he had the specific intent to enter free from official restraint. See id. at 929. We rejected that argument in Lombera-Valdovinos, see id. at 929-30, and the government does not reassert it here. Indeed, the government conceded the point on appeal in Lombera-Valdovinos. See id. at 929.

. Although the government on appeal has conceded the district court misapplied Lomb-era-Valdovinos, government counsel said nothing in the district court while Argueta’s counsel and the court debated the proper legal standard. Had the government pointed out at that time that Argueta was articulating the correct legal standard for the specific intent element of attempted illegal reentry, the court might have reached a verdict free from legal error. The government’s failure to so advise the court at that time is regrettable.

. Argueta argues remand is not required because the district court has already found a reasonable doubt as to whether he crossed into the United States with the specific intent to enter the countty free from official restraint. Having reviewed the record, we are not persuaded the district court has made such a finding. We therefore reject Argueta’s argument. ■ '

. Judge Bybee suggests the official restraint doctrine may no longer be valid after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which he says “eliminated the concept of ‘entry’ from the INA altogether.” Concurrence at 1166 n. 3. This argument is unpersuasive. First, the provision Judge By-bee focuses on, 8 U.S.C. § 1101(a)(13)(A), expressly continues to rely on the concept of "entry,” by using that term as part of the definition of "admission,” Second, as Judge Bybee acknowledges, we have already held, in Pacheco-Medina, 212 F.3d at 1166, that IIRI-RA’s changes to § 1101(a)(13)(A) did not alter the established meaning of "entry” under § 1326. Third, when Congress adopted IIRI-RA in 1996, it also retained and, even expanded the use of the term “entry” under §§ 1325 and 1326. See Pub.L. No. 104-208, Div. C, Title I, § 105, Title III, § 305 (1996). Given that “entry” had a firmly established meaning at that time — freedom from official restraint— we can infer that Congress intended to retain that meaning when it adopted IIRIRA. Lezam *1160 a-Garcia v. Holder, 666 F.3d 518 (9th Cir.2011), upon which Judge Bybee relies, did not address the “official restraint” doctrine or the meaning of entry under §§ 1325 and 1326, and therefore does not cast doubt on our longstanding precedent applying the official restraint doctrine to entry under §§ 1325 and 1326.

. Oscar seems to have assumed in error that Vasilatos rested on an interpretation of § 1101(a)(13)’s definition of "entry.” Oscar, 496 F.2d at 493-94. But Vasilatos expressly stated that it did not. . The Vasilatos opinion issued after § ll'0i(a)(13) was adopted, but the relevant events occurred before the statute took effect. Vasilatos, 209 F.2d at 196-97. Thus, when we considered the import of § 1101(a)(13) in Oscar, we were writing on a cleaner slate than we realized.