FILED
**United States Court of Appeals**
**Tenth Circuit**

**January 16, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PETRONA GASPAR-MIGUEL,

    Defendant - Appellant.

No. 19-2020

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:18-PO-02441-RB-GBW-1)**
_____

Amanda Skinner, Assistant Federal Public Defender (Stephen P. McCue, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the District of New Mexico, Las Cruces, New Mexico, appearing for Appellant.

Dustin C. Segovia, Assistant United States Attorney (John C. Anderson, United States Attorney, with him on the brief), Office of the United States Attorney for the District of New Mexico, Las Cruces, New Mexico, appearing for Appellee.
_____

Before **BRISCOE**, **KELLY**, and **BACHARACH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Defendant-Appellant Petrona Gaspar-Miguel (Gaspar) appeals the district court's affirmance of her conviction for entering the United States in violation of 8 U.S.C. § 1325(a)(1). Gaspar contends the district court's conclusion that she

"entered" the United States even though she was under the constant surveillance of a border patrol agent is contrary to established law defining "entry." Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject Gaspar's constant surveillance argument and affirm the judgment of the district court.

I

Neither party disputes the relevant facts. *See* Aplt.'s Br. at 16; Aple.'s Br. at 10. A border patrol agent monitoring the border observed a group of people, of whom Gaspar was one, cross the border from Mexico into the United States by walking around a 15-foot high fence. ROA II at 16-17, 19, 20-22, 34. The agent radioed for assistance, and continued to observe the group as they proceeded further into the United States. *Id.* The agent watched the group with binoculars continuously from the time of their crossing until they were apprehended by other agents. *Id.* at 21–23. However, he could not make out any details of the individuals, even to determine how many there were.

Gaspar was charged with illegal entry without inspection, in violation of 8 U.S.C. § 1325(a). Section 1325(a)(1) provides for criminal punishment of "any alien who (1) *enters* or attempts to enter the United States at any time or place other than as designated by immigration officers . . ." 8 U.S.C. § 1325(a)(1) (emphasis added). A motion hearing and bench trial were held before a magistrate judge, who found Gaspar guilty on the theory that she had, in fact, "entered" the United States. Gaspar appealed to the district court and argued her conviction should be overturned because "she did not 'enter' the United States within the meaning of § 1325(a) because she

2

was under official restraint [through constant surveillance] from the time of her entry until her arrest." ROA I at 35.

The district court found that the word "enters" in the immigration context has a long history of requiring not just physical presence in the country, but also freedom from official restraint. But the district court declined to hold that continuous surveillance constituted official restraint and found there was sufficient evidence to convict Gaspar of violating 8 U.S.C. § 1325(a)(1).

## II

The concept of "freedom from official restraint" as a requirement for "entry" in immigration law began in the civil context, as part of the distinction between excludable and deportable aliens. ROA Vol. I at 212–218; *see also United States v. Argueta-Rosales*, 819 F.3d 1149, 1162–63 (9th Cir. 2016) (Bybee, J., concurring in the judgment only). Excludable aliens, turned away at the border, received few due process protections; in contrast, deportable aliens, because they could "move freely within the country and mix with the general population," had greater procedural and substantive rights because the Due Process Clause applies to all "persons" within the United States. *Id.*

In order to align the rights of aliens who had technically crossed the border but were not free to move within the general population with the rights of those aliens turned away at the border, courts created the doctrine of freedom from official restraint. *Id.* The doctrine is based on the legal fiction that an entry is not accomplished until the alien is free from official restraint and can move freely within

3

the country. *Id.* While the doctrine was more typically discussed in the civil context, some courts applied it in criminal cases as well. *See, e.g.*, *United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954[1]) (holding, in the criminal context, that the court would not "disturb" the official restraint theory of entry).

In 1952, Congress enacted the Immigration and Nationality Act (INA). Pub. L. No. 82–414, 66 Stat. 163 (June 27, 1952). The INA consolidated statutory authority over a wide range of immigration issues and laid out a broad definition of the term "entry." *Id.* at 163–67. However, even after the passage of the INA with entry's broad definition, courts continued to treat "freedom from official restraint" as a necessary component of "entry." *See, e.g.*, *United States v. Oscar*, 496 F.2d 492, 493–94 (9th Cir. 1974); *see also United States v. Kavazanjian*, 623 F.2d 730, 736, 739 (1st Cir. 1980).

In 1996, Congress eliminated the definition of the term "entry" from the INA, in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Pub. L. No. 104-208, 110 Stat. 3009 (1996). Now, for purposes of determining what level of due process rights to apply to an alien found within the United States, the relevant distinction has changed. Rather than distinguishing between aliens who are excludable or aliens who are deportable, the line is drawn between aliens who are lawfully admitted and those who are not. *See* 8 U.S.C. § 1101(13)(A). However, the

---

[1] Although enacted by the time *Vasilatos* was decided, the Immigration and Nationality Act was not in effect when the alleged crime occurred.

INA still makes numerous references to "entry," including in the new definition of "admission" itself. *Id.*

When interpreting "entry," we must acknowledge Congress is using a term with a settled meaning. And, if the statute at issue does not dictate otherwise, we must infer that Congress meant to incorporate the term's settled meaning. *See Neder v. United States*, 527 U.S. 1, 21–22 (1999); *see also Sekhar v. United States*, 570 U.S. 729, 733 (2013). Abiding by this same principle, courts and the Board of Immigration Appeals (BIA) have continued to interpret "enter," in a variety of contexts, as only completed once an individual is "free from official restraint." *See, e.g.*, *Lopez v. Sessions*, 851 F.3d 626, 631 (6th Cir. 2017) ("to 'enter' the country under this criminal statute [§ 1326(a)], as under entry for special rule cancellation purposes, the individual must be free from official restraint"); *United States v. Macias*, 740 F.3d 96, 100 (2d Cir. 2014) (noting that, because of the official restraint present, law enforcement's treatment of the defendant would not have resulted in "entry" under § 1326); *United States v. Laville*, 480 F.3d 187, 198 (3d Cir. 2007) (McKee, J., concurring) (noting that entry requires freedom from restraint in order to sustain a conviction under both §§ 1325 and 1326); *and In re Martinez-Serrano*, 25 I. & N. Dec. 151, 153 (BIA 2009) (identifying "freedom from official restraint" as the third requirement of "entry" under "our precedent decisions").

## III

For purposes of this appeal, we need not address the broader question of whether "entry" under § 1325(a) requires freedom from official restraint. We

conclude, as pertinent here, that continuous surveillance by border patrol agents, by itself, does not constitute official restraint.

First, the term "official restraint" is not found in § 1325. Thus, we need not accept, as we might with "enter," that Congress is employing a term with a settled meaning, because Congress has not used that term.

Second, the notion that continuous surveillance alone can amount to official restraint has only recently been applied in the criminal context, where we note several references to the concept in Ninth Circuit cases. *See United States v. Pacheco-Medina*, 212 F.3d 1162, 1166 (9th Cir. 2000) (citing *In re Pierre*, 14 I. & N. Dec. 467 (BIA 1973)); *see also United States v. Gonzalez-Torres*, 309 F.3d 594, 597 (9th Cir. 2002) (holding, under very similar facts, that continuous surveillance of a group entering meant the defendant was never free from official restraint and overturning the defendant's conviction under § 1325) *and United States v. Ruiz-Lopez*, 234 F.3d 445, 449 (9th Cir. 2000).

Third, practical and policy concerns support our treating continuous surveillance differently from other forms of official restraint. From a common-sense viewpoint, that continuous surveillance could be thought of as "restraint" is illogical. If the alien does not know that he is under surveillance, it is difficult to perceive how that surveillance can be said to have prevented that alien from moving "at large and at will within the United States." *Cf. In re Pierre*, 14 I. & N. Dec. at 469 (citing *Chow Chok*, 161 Fed. 630); *accord Pacheco-Medina*, 212 F.3d at 1164. Additionally, as seen in the Ninth Circuit case law, parsing what should or should not qualify as

6

"surveillance" and how continuous it must be can lead to distinctions so fine as to become meaningless, if not arbitrary. *See United States v. Cruz-Escoto*, 476 F.3d 1081, 1087 (9th Cir. 2007) (holding the defendant free from official restraint, because he was not observed at all times after crossing the border); *United States v. Vela-Robles*, 397 F.3d 786, 789 (9th Cir. 2005) (holding that triggering a seismic sensor is not surveillance for purposes of official restraint); *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1218–19 (9th Cir. 2001) (holding that "persistent tracking" is not official restraint); *see also Argueta-Rosales*, 819 F.3d at 1162–63 (Bybee, J. concurring in the judgment only) ("our understanding of when an alien is 'free from official restraint' has reached an absurd position").

As a general matter, treating continuous surveillance as official restraint in turn treats aliens who take exactly the same actions with exactly the same intent as committing different versions of a crime: attempted entry, versus entry. *See also* ROA Vol. I at 225, 227 ("[w]hen police set up sting operations to catch car thieves, clandestinely surveilling the 'bait car' throughout the operation, an individual who successfully steals the bait car is not somehow innocent of the crime simply because law enforcement watched the entire sequence of events unfold"). Further, depending on the exact contours of "continuous surveillance," there is also the potential for perverse incentives for law enforcement agents to "look away" to avoid the application of "continuous surveillance."

We conclude that even if we assume, *arguendo*, that "entry" under § 1325(a)(1) requires freedom from official restraint, continuous surveillance by

7

itself does not constitute official restraint. The judgment of the district court is

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge